## Doran, Executor of Gardner, Appellant, *v.* McConlogue.

[Marked to be reported.]

*Deed—Confidential relation—Setting aside conveyance—Equity.*

The mere relation of master and servant or boarder and landlord raises no implication of confidential relation which the courts can consider in proceedings in equity to set aside a conveyance.

*Mental unsoundness—Effect of finding of auditor.*

The findings of fact by a master as to the mental condition of a grantor, confirmed by the court below, are to be treated as if established by the verdict of a jury and not to be disregarded except for plain mistake.

*Mental unsoundness—Evidence—Opinion of witness—Difficulty of speech.*

The opinion of witnesses who are not experts is no evidence of mental unsoundness, unless they first testify to specific facts showing such mental unsoundness. Mere difficulty of speech following an attack of paralysis is no evidence of mental condition: Per GREEN, J.

*Deed—Consideration—Prior services—Subsequent mortgage.*

To make services rendered a valid consideration for a deed, it is not necessary that there should be an original contract to compensate for the services; it is sufficient if it appear that the services were rendered by

the grantee to the grantor and that these services were recognized, as by a recital in the deed, as at least a part of the consideration upon which the deed was executed.

A mortgage, voluntarily executed by the grantee to a third party, but at the request of the grantor, to secure a debt of the grantor, is a valuable consideration in support of the conveyance, although the mortgage was executed after the deed was made.

*Ratification of deed by mortgage—Estoppel.*

The voluntary execution of a mortgage to a third party by a grantee, at the request of the grantor, to secure a debt of the latter, is binding upon the grantor by way of ratification of the original deed, and by way of estoppel, both as against the creditor who accepted the mortgage upon the faith of the title and as against the grantee who assumed a pecuniary obligation of the grantor.

*Undue influence—Solicitations.*

Moderate solicitation to procure a deed, even when accompanied with tears, does not constitute undue influence.

*Equity—Setting aside conveyances—Volunteer—Legal advice.*

The rule that courts of equity will, for reasons specially operative, exercise the delicate power of setting aside conveyances of property, does not apply to a case such as the above, where the grantee was not a volunteer, and where it appears that he had independent legal advice.

Argued March 10, 1892.    Appeal, No. 226, Jan. T., 1892, from decree of C. P. Northampton Co., April T., 1889, No. 2, dismissing bill for cancellation of conveyance.    Before PAXSON, C. J., GREEN, WILLIAMS, MITCHELL and HEYDRICK, JJ.

The bill was filed by Jeremiah Gardner against Ellen McConlogue and husband.    After the death of the plaintiff, substitution was made of John B. Doran, executor of Jeremiah Gardner, deceased, in his own right and to the use of Mary Ann Nolan, late Mary Ann Gardner, wife of John Nolan, a legatee and devisee under the will of Jeremiah Gardner, deceased, as well as all other devisees and legatees claiming under said will.

The findings of fact by the auditor are given below.    The evidence as to undue influence was as follows:

Ellen McConlogue testified: "I talked about how he had changed the other deed, and now, if anything happened, I had nothing; and he said he knew that, that he had nothing fixed that I could claim, and I said now you have changed the other deed just a short time ago, and he said the best thing I could

do was to send for John Kline, and he mentioned Mary Ann that day and I said how it was that he was making her something and how it was that he had changed his mind, and that he had deeded it to me before and why would he change his mind now and what reason did I give him now and he said that's so ; he always said it was to be mine and he never mentioned anybody else ; I think he said go and bring Mr. Kline up and I said wouldn't it do if Jim brought him up and I told Jim, and Jim went down and brought him up." Further evidence on this point appears in the master's report below.

Kline testified that he did not state to Gardner that there was neither power of revocation nor life estate reserved in the deed, and further testified that Gardner said he wanted the deed made just as before.

The master, Frank Reeder, Esq., gave the following

## "HISTORY OF THE CASE."

" Jeremiah Gardner, the plaintiff in the case, is a native of Ireland, and was at the time of the filing of his bill sixty-eight years of age.   He was a laboring man and was entirely unable either to read or write.   He was addicted to the use of liquor, but was nevertheless of thrifty and saving habits.   For the past twenty-five years he has lived in the borough of South Bethlehem, and during twenty-one years of that period has been employed at the blast furnace of the Bethlehem Iron Co.   His wife and five children are all dead, his wife having died in 1879.   Out of his earnings he accumulated enough to buy a lot of land in South Bethlehem upon which he built five tenement houses.   Four of these were rented to tenants who paid rent aggregating on an average about twenty-eight dollars per month, the fifth he occupied himself.   Ellen McConlogue, one of the defendants, was a niece of the plaintiff's wife, her maiden name being Ellen Nolan.   When she was fourteen years of age she went to live with her aunt, and since that time up to the commencement of this suit, being a period of about seventeen years, lived in the family of plaintiff or in his house with him.   In September, 1885, she was married to James McConlogue, the other defendant.   After the death of her aunt, Ellen McConlogue, then Ellen Nolan and about twenty-one years of age, became plaintiff's housekeeper and performed all the labor connected with the management of the

household affairs. It was the plaintiff's habit during this period to deposit all the money earned by his labor as well as that derived from the rental of his houses in a drawer of the bureau in one of the rooms of his house. To this money the plaintiff and Ellen McConlogue had equal access and apparently equal control over its disbursement. Out of this fund taxes, insurance premiums, store bills and general household expenses were paid by both or either of them as it might happen, and out of its accretions plaintiff, after his wife's death, built two of his houses. While these relations existed between them, plaintiff, on March 10, 1883, made his will in which he left all his property to the said Ellen McConlogue, describing her as his 'esteemed adopted daughter.' Two years later, on Feb. 14, 1885, he made and delivered to the defendant Ellen McConlogue a fee simple deed of all his property above mentioned. It is explained by the plaintiff, and is doubtless. true primarily, that the deed of Feb. 14, 1885, was made by him because of a suit threatened to be brought against him as one of the trustees on the bond of a defaulting tax collector. In the following year, 1886, on August 10, Ellen McConlogue, then married to her co-defendant, reconveyed the said real estate to the plaintiff. Matters stood thus in July, 1887. Somewhere about the first of July, the exact date not being fixed by any of the witnesses, plaintiff had a stroke of paralysis. He was attended by a physician who paid him five visits, and who describes the attack as 'only a partial attack.' In the first week of this illness, plaintiff went up and down stairs, dressed and undressed himself, and went once to church alone. About two or three weeks after this stroke plaintiff executed a deed bearing date July 19, 1887, conveying all his real estate to Ellen McConlogue. The consideration named in the deed is 'five hundred dollars, and natural love and affection and services rendered me as my housekeeper from the death of my beloved wife,' but no money was in point of fact paid to plaintiff by Ellen McConlogue. The deed was prepared by John Kline, Esq., an attorney at law, its execution was witnessed by him, the only witness, and the acknowledgment taken by him as notary public. It is alleged on the part of the plaintiff that at the time of the execution of this deed he was not in the full possession of his mental faculties, and

that, owing to the enfeebled condition of his mind and the fraud and imposition practiced on him by Ellen McConlogue, the deed was improperly obtained and that he did not know what he was doing. After the deed was executed and delivered to Ellen McConlogue, plaintiff continued—up to the time of the bringing of the suit and the taking of the testimony—to collect the rent of the houses conveyed by the deed and exercised all the rights of ownership. It is claimed on the part of the plaintiff that he did not know the contents of the deed executed by him on July 19, 1887, and did not discover its import until long after. This is denied by the defendants. On Jan. 28, 1889, after a conference with Ashton C. Borhek who was a creditor of plaintiff, plaintiff met the defendant Ellen McConlogue and A. C. Borhek, at the office of John Kline, Esq. At that interview Ellen McConlogue executed and delivered to Mr. Borhek a mortgage on the premises in dispute to secure the payment of $631.75, a debt due Borhek from the plaintiff. This was done at plaintiff's request. It is also asserted by the defendants, but denied by plaintiff, that at the same time the plaintiff stated that the deed in controversy was his voluntary act, and upon his acknowledging that the signature was his genuine signature or mark, Borhek added his name as a witness thereto. The bill in this suit was filed March 28, 1889."

The master made the following specific findings of fact:

" The master presents the following findings of fact, having in mind, in reaching his conclusions upon the disputed questions of fact, that the burden of proof is upon the plaintiff to establish, by clear and precise evidence, such matters of fact as are essential to the granting of the relief he invokes :

" 1. The master finds as facts the allegations made in the bill and admitted in the answer and which are hereinbefore specifically narrated in the ' History of the Case.'

" 2. That the premises in question are of the value of $4,500.

" 3. That [plaintiff, on July 19, 1887, was of sufficient mental capacity to make a valid disposition of his property, although weaker of intellect than before the stroke of paralysis.] [1]

" 4. That the deed of July 19, 1887, was not procured by defendants' fraud and imposition and that no undue advantage was taken, by the grantee, of his enfeebled condition.

" 5. That [Jeremiah Gardner knew the purport of the deed of July 19, 1887, and that he was again fully informed of its contents and effect in the spring of 1888.] [2]

" 6. That [Jeremiah Gardner did, on Jan. 28, 1889, ratify and confirm the deed of July 19, 1887.] [3]

" 7. That [there was a valid consideration for the conveyance of July 19, 1887.] [5]

" 8. That during the lifetime of his wife Jeremiah Gardner made a will by the terms of which he left a life estate to his wife with the remainder to Ellen McConlogue."

On the subject of undue influence, the master reported :

" Of undue influence, strictly speaking, there is not a jot of evidence. Plaintiff himself, in his testimony, does not even mention any attempt to unduly influence his mind. There was a quasi family and confidential relation existing between the parties and the proof of undue or improper influence therefor need not be of the indubitable character which would be required if the relations were not close and confidential, but the master does not hesitate to say that he can perceive absolutely no evidence whatever of the exercise of any undue influence. The plaintiff says that a long time before the deed was actually made Ellen McConlogue asked him to deed this property to her and that he then announced to her his determination to give her half and his niece Mary Ann the other half. He says that Mrs. McConlogue then began to cry and he walked away. Under the decisions this is not undue influence. Mrs. McConlogue recites the same conversation substantially, but says that it was on the morning the deed was made and that it ended in plaintiff's consenting to make the conveyance and directing her to send for the attorney to prepare the instrument. This, under the decisions is not influence. Fair argument and persuasion not carried to the point of importunity, has never been construed to be the exercise of undue influence, and it is not likely that it ever will."

After reviewing and discussing the evidence, which was conflicting, the auditor concluded :

" A number of authorities were cited by plaintiff's counsel in support of the doctrine or theory that the burden of proof in this case rested upon the defendants to show that the conveyance in question was not the result of any undue advan-

tage taken by them of the plaintiff's mental condition, and that the transaction was fair and equitable. The master is unable to see that the cases cited rule the one before him, and an analysis of them will, in his opinion, develop this fact. The following are the cases referred to :

"Springer's Appeal, 111 Pa. 228. This was the case of an agreement between a woman of great age and impaired mind, by which she relinquished a testamentary charge upon her son's farm, which was her sole support, in consideration of his payment to her annually of a sum of money which was about one twelfth the amount she was entitled to receive, and which was insufficient to provide her with the bare necessaries of life. In that case there was no proof whatever that the mother had any well settled purpose to add to her son's worldly situation which found expression in the agreement. There was the relationship of mother and son. There was a finding of fact that her mind was impaired. And most important and significant of all, to cite the language of Justice Sterrett, "the testimony discloses a case of gross misconduct on the part of the appellant, in attempting to overreach his mother by taking advantage of her weak and helpless condition, such as no court in equity can sanction and encourage." In the case at bar, as the master has already pointed out, there is absolutely no testimony tending to show any misconduct on the part of Ellen McConlogue or her husband.

"Worrall's Appeal, 110 Pa. 349. In this case the court find that the grantee stood in the relation of parent to the grantor. The property conveyed was of the value of $13,000 ; the consideration was fifteen dollars. There was no other consideration. The conveyance was virtually a gift, and the court concludes its opinion in the case in the following language : ' Unless there is something suspicious in the circumstances, or the nature and amount of the gift is such that it ought not to have been accepted even if freely tendered, the donee will not be called upon to show that the transaction was in all respects fair and honest, and in no respect tainted by fraud or undue influence.' It is also authority for the doctrine that ' where the question agitated is a gift, the rule would seem to be more stringent than where the advantage flows from a contract or mutual arrangement.'

" Miskey's Appeal, 107 Pa. 611, is another case of gift. The donor was a son, the donee was his father. The son was of grossly intemperate habits, and by his gift left his own wife wholly unprovided for. The case decides that 'in the case of a *voluntary* deed from a son to a father, who is a beneficiary under it, the burden of proof is upon the latter to show that he has taken no advantage of his influence or knowledge, and that the arrangement is fair and conscionable. A rule of law laid down to govern voluntary deeds or gifts, is not the proper rule to apply to a conveyance founded upon an adequate consideration.'

" Russell's Appeal, 75 Pa. 269, is another case of a voluntary gift. In this case the courts found as matter of fact that the conveyance in question was executed by mistake.

" The utmost that can be contended from the above authorities is that they sustain the well known principle that a court of equity *may* set aside a conveyance for inadequacy of price or because of the confidential relations subsisting between the parties to a transaction, if the transaction be otherwise open to suspicion, and that, in a voluntary deed or gift, which is suspicious in its appearance or unfair and unconscionable in its terms, the burden of proof is cast upon the donee to prove that the instrument has not been procured by any undue advantage. But those principles do not fit the facts in the case under discussion."

Plaintiff excepted, *inter alia*, to the findings of fact in brackets above. The 23d exception alleged that the master erred in not finding the following facts :

" (*a*) That Ellen McConlogue by her importunities directed on the mind of a feeble paralytic aged 66 years, at a time when he believed himself *in extremis*, and when he was flighty and irrational, caused him to sign a deed conveying to her absolutely all he had in the world, valued at from five to seven thousand dollars.

" (*b*) That the grantee at the time stood in a confidential relation to the grantor as his housekeeper and nurse.

" (*c*) That the grantor, even if he had not paid her for her housekeeping, would not have been indebted to her more than five or six hundred dollars, and that the consideration was grossly inadequate.

" (*d*) That the scrivener was in the employ of the grantee and failed to make known to plaintiff the absence of a power of revocation, or to suggest his seeking independent advice.

" (*e*) That the concealment of the conveyance from the plaintiff, and of plaintiff's illness from his relatives by defendant indicated that the transaction was not done fairly or conscionably.

" (*f*) That the alleged confirmation was had through the same instruments as procured the deed, and was presumptively tainted with the same unfairness and fraud as the original transaction. [4]

" 24. The master erred in not holding that under the circumstances the law implied constructive fraud, and threw upon the defendants the burden of showing that the conveyance was not the result of any undue influence and that no undue advantage was taken of plaintiff's mental condition and that the transaction was fair and equitable." [6]

The court dismissed the exceptions and confirmed the report, in an opinion, *inter alia*, as follows, by SCHUYLER, P. J.:

" If the master is right on the question of the location of the burden of proof, clearly the plaintiff has no standing in court. The ground on which the plaintiff relies as taking the present case out of the general rule followed by the master is, that there existed between the plaintiff and defendant a confidential relation. If this be so, we think the bill should have contained an averment to that effect; for how otherwise could the defendant be prepared to meet such a charge? There are some relations, such as parent and child, guardian and ward, attorney and client, and the like, which the law *presumes* to be confidential, and hence it is unnecessary either to plead or prove their confidential character; but there is no fiduciary relation *ipso facto* between a man and his housekeeper, or between an uncle and his deceased wife's niece: See 2 Pom. Eq. Jur., p. 496, note; Audenreid's Appeal, 89 Pa. 124.

" As has been seen, the allegation in the bill is that the deed in controversy was procured ' by fraud and imposition.' The subject of confidential relations is not even hinted at, which distinguishes this case from Worrall's Appeal, 110 Pa. 349, so much relied on by the plaintiff, where the existence of the confidential relation was the very issue raised by the pleadings.

The plaintiff, I think, has made the mistake of confounding the distinction between actual fraud and that kind of constructive fraud which grows out of the relations of the parties. That there is such a distinction is clearly shown in 2 Pom. Eq. Jur., § 955, where the subject is fully discussed with the author's usual intelligence. But it so happens that the omission to charge constructive fraud is immaterial, as [there is not the slightest evidence of a fiduciary or confidential relation existing between the plaintiff and defendant.] [7] Let it be conceded as claimed that the defendant stood towards the plaintiff as an adopted daughter and that the deed was without consideration. We then have presented the case of a gift from a parent to a child. This is not the kind of transaction which courts of equity regard with jealousy. Cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity ; a gift from parent to child is certainly not presumed to be invalid : 2 Pom. Eq. Jur., § 962."

*Errors assigned* were (1–6) dismissal of exceptions, quoting them; (7) holding as in brackets in the opinion, quoting it; and (8) dismissing exceptions and confirming report.


*W. E. Doster* and *John D. Hoffman*, for appellants.—The preponderance of proof is that plaintiff was not of sufficient mental capacity to make the deed. The evidence of Dr. Malone, the attending physician, must outweigh that of all the other witnesses.

The direction to the attorney to make a deed " the same as before " meant to the mind of the old man a revocable instrument, one that would be delivered up again upon his mere asking it, a deed with power of revocation and life estate reserved.

Ratification can only stand on the clearest evidence : Morse v. Royal, 12 Ves. 373. If a party is still under the pressure of the original transaction or the original necessity, courts of equity will not hold him barred from relief by confirmation : Story, Eq. Juris. § 371.

The evidence established that there existed in fact a confidential relation, even if there is no legal presumption that it existed. If this evidence had been offered by plaintiff's counsel and defendant had been taken by surprise and objected,

the absence of the averment in the bill might have some force.

A conveyance may be impeached for mere weakness of intellect, provided that it be coupled with other circumstances to show that the weakness, such as it was, had been taken advantage of by the other party. Adams' Eq., p. 182.

The Pennsylvania cases upon which we rely are cited by the master and by him misconstrued. Worrall's Appeal is exactly our case.

If a grant which exceeds all just measure as a gift, and without an equivalent as a contract, be not due to fraud or undue influence, it affords ground for believing that the grantor's reason had ceased to be a safe guide for his actions: Cruise v. Christopher, 5 Dana (Ky.) 181; Kelly v. McGuire, 15 Ark. 555.

When there is weakness or imbecility of mind arising from old age, intemperance, weakness or other cause, and inadequacy of consideration; or when there is a weakness of mind and circumstances of undue influence and advantage; in either case the contract may be set aside in equity: Tracey v. Sacket, 1 Ohio, N. S. 55; Wilson v. Oldham, 12 B. Mon. 55.

A person taking a benefit under a voluntary gift which is not subject to a power of revocation, has thrown upon him the burden of proving that the gift was meant by the donor to be irrevocable: Wollaston v. Tribe, L. R. 9 Eq. 44.

Where the donor ought to be advised to retain a power of revocation, it is the duty of the solicitor to insist upon the insertion of such a power, and the want of it will, in general, be fatal to the deed: Coutts v. Acworth, L. R. 8 Eq. 558.

*Edward J. Fox,* for appellee.—Where the findings of the master are approved by the court, clear error must be pointed out to authorize a reversal: Morgan's Ap., 25 W. N. 532; Stocker v. Hutter, 134 Pa. 19; Kutz's Ap., 100 Pa. 75; Lewis's Ap., 127 Pa. 127. See especially the language of PAXSON, C. J., in the first case.

The overwhelming weight of the testimony is that Gardner was of sufficient mental capacity to make the deed. There was no testimony as to that particular point of time to show that he was not.

Witnesses who are not experts cannot give opinion as to

mental condition without first testifying to specific facts show-
ing such condition: Bank v. Wirebach, 106 Pa. 37; Elcessor
v. Elcessor, 1 Adv. R. 194.

The fourth assignment of error is bad for duplicity: Rule
XXII.

Solicitations, however importunate, cannot of themselves
constitute undue influence: Trost v. Dingler, 118 Pa. 259;
Tawney v. Levy, 76 Pa. 106; Stokes v. Miller, 10 W. N. 241;
Herster v. Herster, 122 Pa. 239.

The idea of confidential relationship necessarily involves
the idea not only of trust and dependency but also that in
some way there is control growing out of this relation. This
was a leading feature in Worrall's Appeal.

Weakness of intellect is not sufficient to avoid a deed:
Lynch's Ap., 97 Pa. 349; Myers's Ap., 16 W. N. 137; Beirer's
Ap., 92 Pa. 267; Richard's Ap., 100 Pa. 51; Cummins v. Hurl-
butt, 92 Pa. 165.

Where a defendant in express terms negatives the allega-
tions of a bill and the evidence of only one witness affirms
what has been so negatived, the court will simply dismiss the
bill: Campbell v. Patterson, 95 Pa. 447.

The cases cited by the counsel for appellant are not apposite
for the reason that they all relate to cases where there was a
voluntary conveyance.


Opinion by Mr. Justice Green, June 1, 1892.

After a very patient and attentive reading of all the testi-
mony in this case relating to the material points of contention,
and upon a full consideration of the able argument of the
learned counsel for the appellant, we are of the opinion that
the findings of fact and conclusions of law contained in the
master's report are correct. The findings of fact, having been
confirmed by the decree of the learned court below, are to be
treated as if established by the verdict of a jury, and not to
be disregarded except for plain mistake.

It seems to us that the findings of fact are clearly justified
and sustained by practically all the material portions of the
testimony. The leading points of contention relate to the
question of confidential relation between Jeremiah Gardner
and his wife's niece, Ellen McConlogue, to the mental condi-

tion of Gardner at the time of the execution of the deed of July 19, 1887, and to the consideration of the deed. The allegation that there was fraud or undue influence, or imposition of any kind practiced by Mrs. McConlogue upon Mr. Gardner, is entirely unsupported by the testimony.

In reference to the question of confidential relation, we are clearly of opinion that no such relation existed. The undisputed testimony shows that Mrs. McConlogue was, for the greater part of the time, the servant of Mr. Gardner, and, from the time of his wife's death, his housekeeper. In her capacity as servant she performed all the menial services required from a person occupying such a position, attended to all the cooking, washing, scrubbing and other household duties which devolved upon her, until the time of her marriage. From that time Gardner seems to have merely lived with the defendants as a boarder, upon consideration that they were to occupy the house without any charge for rent, and that he was to furnish the fuel consumed in the house.

While it is true that Mrs. McConlogue was, to a certain extent, in custody of the rent and other moneys which were received by or for Mr. Gardner, it is also true that he had entirely free access thereto and the use thereof, and continued in the reception of the income of the property until the time of his death. There is no evidence that she, at any time, appropriated any portion of these moneys to her use, and there does not appear to be any allegation or proof that she was paid any money by way of compensation for her services. We fail to discover any evidence establishing a relation of trust or confidence on her part other than such as would exist between a master and a faithful servant.

So far as the relation of a boarder in the family of defendants is concerned, it is quite plain that no trust or especial confidence can be held to exist between them. In case of Audenreid's Ap., 89 Pa. 114, we held that there was nothing in the confidential relation of a medical adviser to a patient that *per se* forbids the acceptance of a gift by him from his patient. We cannot see that in the mere relation of master and servant there can be any implication of confidential relation, and, of course, there is none between a boarder and his landlord. We therefore dismiss that portion of the case from further consideration.

The case then must stand upon the allegations of mental unsoundness on the part of the grantor in the deed of July, 1887, and upon want of consideration for the execution of the deed. Incidentally, in this connection, the question of subsequent ratification arises, which we will presently consider.

So far as the averment of mental unsoundness of the grantor is concerned, we have carefully read the whole of the testimony bearing upon that subject, and we are constrained to say that we think it altogether inadequate to establish the fact of such condition. While it is true that the grantor was the subject of an attack of paralysis, the evidence of the attending physicians shows that it was not a severe attack, and that it affected chiefly the patient's power of locomotion and control of his limbs and other members, and does not indicate that there was any degree of mental aberration. Mere difficulty of speech, in such cases, proves nothing as to mental condition.

Dr. Malone, who attended him on five consecutive days immediately after his attack, testified to his physical condition as being one of great feebleness, and that at times he was not able to talk intelligently, and that, in his opinion, at those times he was not competent to transact business. But he also testified that the attack was only a partial one, and that he improved under his treatment, and that at the end of five days he ceased visiting him. He said that he had very little conversation with him, on account of his difficulty of speech, but that Gardner managed to make known his condition in reply to questions as to what was the matter with him. He said, also, that when he ceased to visit him there was some improvement in his mind, though he was still not clear, and, also, that he supposed that Gardner knew what property he had. He testified in addition, that, after he had ceased his visits, Gardner came to his office sometimes, and they would talk together, and when he would meet him on the streets he would tell him how he was getting along; that he thought he was better than he was, and that this was immediately after he ceased his visits.

Dr. Stout, who attended Mr. Gardner shortly after his attack, said that the patient called at his office and told him that he had had an attack of paralysis recently, and that he treated him once or twice for that disease. He said that his face was partly paralyzed, and that he had conversations with him and observed

him, and that, in his opinion, his mind did not seem to be affected; that it appeared to be clear; and that the attack was a slight one. He also said, that, at that time, in his judgment, Gardner was competent to transact business, so far as intellect was concerned.

Dr. Addis, who was attending Mrs. McConlogue during her confinement, shortly after Gardner's attack, testified to his observing his condition and to full conversations with him, and said he did not notice any impairment of his mind on those occasions, that the attack was a slight one, and that he spoke as rationally as at all other times. He was asked: "Q. From your observations, are you of opinion that he was of sound and disposing mind and memory at that time? A. Yes; at that time it never occurred to me otherwise."

Patrick Whalen, Mary Ann Gardner and Martin Dewire, were the other witnesses of the appellant on this subject, but an examination of their testimony fails to disclose any specific facts showing mental unsoundness, and without such facts, as we have often held, opinions are of no value.

By far the most important testimony on the subject of the sanity of the grantor, at the time of the execution of the deed, was that of John Kline. He was the attorney who wrote the deed in question, and he described the circumstances attending the preparation and execution of the deed in detail. When he entered the room he asked Gardner what he wanted of him, and was told he wanted the witness to make a deed over to Ellie, and wanted it done that day. After some further conversation, Kline went out and got a blank deed and brought it back, and wrote the deed in the old man's presence, and he testified: "After the deed was written, I read it over to him. Q. The whole deed? A. Yes; and explained it to him. I told him what it contained, and he expressed satisfaction. Q. What did he say? A. He said it is all right, she is the only one I care anything for." He described the execution of the deed and its acknowledgment, and testified that, in his opinion, Gardner was, at the time of executing the deed, of sound and disposing mind. Other witnesses having opportunities of observation and knowledge of the man, testified to the same effect. It is not necessary to enlarge upon the testimony on this subject. It is sufficient to say that, in our opinion, it fully justified

the master in his finding that, as a fact, Gardner was of sound mind, and understood fully what he was doing when he executed the deed.

The case is not the ordinary one of a single voluntary conveyance, by a person, of all, or part of his estate to another. A similar conveyance was made by Gardner to Mrs. McConlogue some years before, when there was not the slightest question as to his mental soundness. Subsequently he asked her and her husband to reconvey to him the property, and they did so. He also made at least one will in her favor, giving her all his property, and finally made the deed in question at a time when he supposed he had not long to live.

In addition to the foregoing, he most distinctly confirmed and ratified the deed, by having Mrs. McConlogue and her husband execute a mortgage upon this very property, to secure a debt of $600 which he owed to A. C. Borhek. This gentleman was examined as a witness and testified that he had some hesitancy about accepting the mortgage, because the deed of July 19, 1887, only had one attesting witness, and thereupon Gardner acknowledged, in January, 1889, to Borhek and Kline, that he had executed the deed, and Borhek signed it as an attesting witness. Kline also testified to the same facts, and, in view of this testimony, the finding of the master that this was a ratification of the deed, was not only justified, but peremptorily required by the overwhelming weight of the evidence. The mortgage was a direct asserting of the title of the mortgagors, and that title was literally created by the very deed which the grantor is seeking by this proceeding to have set aside. He certainly could not be permitted to do this as against the mortgagee, whom he induced to accept the mortgage as a valid security for his debt. As a distinct act of ratification, it was just as efficacious as between him and his grantee in the deed.

It was further found by the master that there was a good consideration for the deed. In this finding, also, we concur. It was not at all necessary that there should have been an original contract to compensate Mrs. McConlogue for her services in order to sustain the validity of the deed. It is quite sufficient if it appear, as it abundantly does, that services were rendered by the grantee to the grantor, and, by the recital in

the deed, these services were distinctly recognized as, at least, a part of the consideration upon which the deed was executed. In addition to that, the grantee voluntarily, but at the request of the grantor, encumbered the property with a mortgage to secure a debt of the grantor to the extent of $600, and that was, in any point of view, a valuable consideration in support of the conveyance, although it occurred after the deed was made. This transaction was binding upon the grantor by way of ratification of the original deed, by way of estoppel, both as against the creditor who accepted the mortgage upon the faith of the title, and as against the grantee who assumed a pecuniary obligation of the grantor, and as an added consideration to the original consideration of services long-continued and valuable in their character, rendered by the grantee to the grantor.

All the features we have thus referred to establish a wide difference between this case and those which usually appear in the books, in which courts of equity do occasionally, and for reasons specially operative, exercise the very delicate power of setting aside executed obligations and conveyances of property. We do not consider that any of the persuasive reasons which influence courts in the exercise of this power are present here. For in this case the grantee was not a volunteer, but a meritorious party, who had actually furnished a valuable consideration in the form of substantial personal services for a number of years, of which the grantor had received the full benefit. Added to this, she assumed a pecuniary obligation of the grantor at his request to the amount of $600, and conferred a distinct lien upon the property to that extent. The principles upon which a voluntary conveyance are set aside in equity have no application in such a case. It is, moreover, absolutely certain that the grantor knew thoroughly well what he was doing when he executed the deed in question, and thereby did precisely what he intended to do, and had done twice before, both by deed and by will, and it therefore cannot possibly be said that he acted in ignorance of the consequences of the transaction.

But, in addition to this, it is testified most positively by the legal adviser who drew the deed, that he received and literally carried out, the specific instructions of the grantor in the preparation of the deed ; that he read over the deed to the grantor and explained its contents to him before it was signed, and that

he had been, and was, in the habit of rendering professional
services to the grantor on other occasions, and had ample rea-
son to suppose he was doing so in this instance.   Therefore it
cannot be said that the grantor did not have the benefit of in-
dependent legal advice.    There is not the slightest reason to
discredit the testimony of the legal adviser who performed this
service.   He is entirely disinterested, and a thoroughly reputa-
ble gentleman and lawyer, and there is not a shred of testi-
mony in the case impugning either his veracity or his integrity.

To cap the climax of the mass of testimony tending so pow-
erfully to establish the validity of the deed in question, there
is entirely undisputed evidence of an explicit act of subse-
quent ratification eighteen months after the execution of the
deed.   This included, not merely a fresh consideration given,
but a new and specific declaration of the formal execution of
the deed, and a new attestation of it by another and indepen-
dent witness.   The testimony on this subject is of the most
satisfactory and conclusive character, it is entirely trustworthy
in every respect, and no court could possibly disregard it in the
just performance of its duty.   There is no pretence that the
grantor was not at this time perfectly conscious of the act he
was doing, that he was not in the full possession of his facul-
ties, or that he was in any degree influenced against his will or
his desire.   On the contrary, the giving of the mortgage for
his own debt by the grantee in the deed and her husband, who
were not subject to any legal obligation to do so, was done at
his personal instance and desire, and for his own personal ben-
efit and advantage.

It is only necessary to add, that the account given by Gard-
ner, who was examined as a witness, of the circumstances oc-
curring at the execution of the deed, is simply absurd, and
quite unworthy of belief.   It is interested testimony, at the
best, and is so incredible in its details, and so entirely opposed
to all the other testimony as to the same transaction, that no
court or jury could give it credence.   It was not believed by
the master or court below, and it is not believed by us.

In regard to the non-insertion of a power of revocation in
the deed, it is only necessary to say that, as this was not a
mere voluntary conveyance, but one founded upon a good con-
sideration, it was not proper that it should contain a power of

revocation, and the absence of such a power is entirely imma-ˈ
terial.

Nor do we consider that there was any unreasonable impor-
tunity on the part of Mrs. McConlogue in obtaining the exe-
cution of the deed. We discover no evidence of anything
more than a moderate and proper solicitation, and but little of
that. As she had rendered him valuable service through many
years, and as he had once before conveyed the whole property
to her, which she had reconveyed at his request, she had a rea-
sonable right to expect that, in making another deed to her, he
would do the same as he had done before, and if she had gone
beyond any solicitation appearing in the testimony, she would
have been fully justified in doing so, and within the limit al-
lowed by the law.

Upon a review of the whole of the testimony, we quite agree
with the master and court below, in finding that Jeremiah Gard-
ner was mentally competent to convey his property on June 19,
1887, that no fraud or imposition was practiced upon him in
the procurement of the disputed conveyance, and that he was
not influenced to execute it by any undue solicitation ; that
the defendant, Ellen McConlogue, had rendered much valua-
ble service to Gardner during a long period of time, which was
duly recognized by him, and which constitutes a good consid-
eration for the deed in controversy ; that she was not disquali-
fied from receiving the deed by any relation of trust or confidence
to him ; that there was a distinct and emphatic subsequent rati-
fication of the deed, and an additional consideration then fur-
nished in support of the deed by Mrs. McConlogue, and that
there is no sufficient reason why a court of equity should in-
terfere to set aside the deed in question. The report of the
learned master in the court below is an extremely able, ex-
haustive and calmly judicial review of all the evidence in the
case, and of the law applicable in the consideration of this
class of cases, and we think the learned court below was en-
tirely justified in its disposition of the exceptions to the report.

The decree of the court below is affirmed, and appeal dis-
missed at the cost of the appellants.