## Beyl v. Berger.

*Equity—Confidential relation—Fraudulent conveyance—Burden of proof.*

1. A employed B as a housekeeper at $1.50 a week. The evidence showed that A was feeble in mind and body; that B was a dominant personality and occupied a confidential relation to A; that B had secured from A the transfer of certain shares of stock, the transfer of a mortgage, and finally the transfer of a property, so that, before A's death, B owned everything that he had. The transfer to B was by a plain deed, but at the same time an agreement was entered into, which was recorded in the Book of Miscellanies, by which B agreed to wait on A, take care of him and bury him. In a proceeding to compel B to account and to reconvey the property to A's executor, it was held that a confidential relation having existed between A and B, the burden was upon B to show by "full and satisfactory proof" that A understood that his transfers completely stripped him of all his property, and that he understood the transaction and its consequences, and that B, having failed to do this, must reconvey the real estate as prayed for.

2. As it appeared that the money which B had received had been expended in the support of both A and B, B was not directed to account for the same.

3. While the fact that the deed and the agreement were prepared by A's attorney is entitled to great weight in considering the evidence in the case, where it appears that counsel did not explain the effect of the transaction to A, the mere fact that A had advice of independent counsel does not take the place of the "full and satisfactory proof" which is required.

Bill in equity for an accounting and for a reconveyance of real estate. C. P. Northampton Co., April T., 1921, No. 3.

*Smith, Paff & Laub,* for plaintiff.

*A. C. La Barre* and *Russell N. Koplin,* for defendant.

STEWART, P. J., March 6, 1922.—The burden was on the defendant to show by full and satisfactory proof that the deed and contract by which she received all of Joseph Beyl's property were executed by him after the bargain and all its consequences had been fully explained to him, and to show that he understood the effect thereof, and the defendant has failed to remove that burden by such proof.

### Discussion.

This is a bill in equity asking that a conveyance of property and an assignment of mortgage be decreed to be fraudulent, and that defendant reconvey

the premises and account for moneys received. The findings of fact and conclusions of law filed in answer to the parties' requests, with the above conclusion of law, are sufficient without further findings by the court. To understand the case, we give the following resumé of the facts:

Joseph Beyl died testate on Aug. 11, 1920, without issue and unmarried, aged eighty-one years. The defendant had been his housekeeper for eighteen or nineteen years, and was paid $1.50 a week for her services. The last settlement for wages was in May, 1916. Mr. Beyl's will was dated April 15, 1915. In it he devised $2500 to Charles Urfer, $284 to Cora Smock, $500 to the Lower Saucon Cemetery Company, and the income of all the residue of his estate, real, personal and mixed, to the defendant during her natural life, and after her death the property was to be sold and the proceeds divided among his brothers and sisters or their heirs. After the making of the will, on May 25, 1917, Joseph Beyl sold a piece of real estate and received $11,000 in cash therefor. Of this sum it appeared in evidence that he invested the sum of $3500 in stocks that had no value, and received certificates for the same on May 25, 1918. One of these companies was the Titan Automatic Tool Company. That stock was transferred to Mrs. Berger on Aug. 23, 1918. Another was the Sea Products Company. That stock was transferred to her on Aug. 28, 1918. Another was the Standard Process Steel Corporation. That stock was transferred to her on Jan. 20, 1920. It appears that the certificate had been lost and did not turn up until then. While it is true that these stocks were what is known as "wildcat" stocks and had no value, yet within three months Mrs. Berger got them as her own property, and the only consideration she testified to was that he gave the certificates to her "so that after his death I would have good interest to live on." What became of the difference between $11,000 and $3500 did not appear in the testimony. Mrs. Berger testified that the whole sum that Mr. Beyl received was only $7000; that she did not know what he had done with the money, and that she did not know where it was at the time of trial. Whether that difference was $3500 or $7500, no one was able to explain what had become of the money. It has simply disappeared. It also appeared that Mr. Beyl had a mortgage given by Charles W. Finady in 1911 for $2500. On Dec. 26, 1918, the same date that the deed was transferred, that mortgage was assigned by Mr. Beyl to the defendant, and the assignment was recorded Dec. 27, 1918. Mr. Finady paid $500 to the defendant, and later paid $2000, and she testified that the entire sum was used in paying the household expenses of Mr. Beyl and herself. It also appeared that on that day, Dec. 26, 1918, Mr. Beyl conveyed his homestead property to the defendant by a plain deed, which was recorded on Dec. 27, 1918. The consideration in that deed was $1. In her testimony she stated that the consideration of the transfer was that she was to wait on him, take care of him and bury him. That property was stated in the bill to be worth $8000. The answer neither admits nor denies the correctness of that amount, and the defendant said she was unable to give its value. From the pleadings not being specifically denied, it may be assumed to be worth the amount stated. It was a two-story double frame house in a populous locality. It also appeared in evidence that on the same day that the mortgage was assigned and the property conveyed, Mr. Beyl and Mrs. Berger entered into an agreement which was duly recorded on Dec. 27, 1918, in the office of the Recorder in Book of Miscellanies. That agreement provided as follows: "Whereas, the said Joseph Beyl, party of the first part, has of even date herewith conveyed by deed of conveyance his Homestead and land appurtenant thereto, situated in said Township of Lower Saucon, County and State afore-

2 D. & C.

said, for good and valuable consideration, to said Anna L. Berger, party of the second part, her heirs and assigns, and also assigned a certain Bond and Mortgage, bearing date the first day of April, A. D. 1911, Charles W. Finady, Mortgagee, which mortgage is recorded in the office for recording of deeds, etc., at Easton, in and for Northampton County, in Mortgage Book No. 194, page 614, etc., to the said Anna L. Berger. Now this Agreement Witnesseth, that the said Anna L. Berger, party of the second part, in consideration of the premises above set forth, hereby covenants and agrees with the said Joseph Beyl, party of the first part, that she, the said Anna L. Berger, will continue to be and remain the housekeeper, and care for, maintain and support, in health and sickness, the said Joseph Beyl for and during the term and remainder of his natural life, and upon his decease properly, and in keeping with his present financial condition and circumstances, cause his respected body to be duly interred in the Cemetery selected by the said Joseph Beyl, and in all things attend him in and with such ministrations as are conducted and prevail in a Christian community. Should said Anna L. Berger die before the said Joseph Beyl, Cora May Smock, a daughter of said Anna L. Berger, shall succeed to the duties of her mother herein set forth and faithfully perform the same." It will thus appear that Mr. Beyl had transferred everything he possessed (so far as any one connected with the suit knows) to the defendant. He had completely stripped himself of all his property almost two years before he died. At that date the only possible indebtedness that he would owe to Mrs. Berger would be $200, and if the sum be calculated up to the time of his death, it would be about $350. His condition can best be stated by her testimony (page 28), as follows: "Q. At the time of his death you had everything that Mr. Beyl had, didn't you? A. I had it before he was dead. Q. You couldn't have gotten it after his death? A. No; sure not. Q. But just shortly before his death you had every cent that he had, didn't you? A. Yes, sir. Q. You didn't overlook one copper? A. No, not of his money. We couldn't live if he had no money. We couldn't live no more; that was it, he would give it all away." The bill alleged want of consideration for the transfer; that Joseph Beyl was weak-minded; that the defendant unduly influenced him, and that there was a confidential relationship between the defendant and Mr. Beyl. The answer denied these allegations, and set up that the transfers were made voluntarily, and that there was a good consideration for the same. A study of the cases shows that the position of a chancellor is a most difficult and delicate one in cases of this character, and we feel that we must look at this case very much from the position that it would be looked at if Mr. Beyl himself were asking to have this conveyance set aside. It was a bad bargain, made by a man who was in feeble health and whose mind was weakened. The defendant was a woman sixty years of age at the time of the transaction. On the witness-stand she appeared to possess a dominant, strong, persistent mind. She had intelligence and nerve. Witnesses testified that she said she wanted to get all the old man had, and the impression made on our mind by the witness on the stand was that, as between Mr. Beyl and herself, she was by far the stronger character. He had made a will which gave specific bequests to certain parties, which made provision for the care of his family plot, and which then gave her the benefit of a life interest in his estate, and after her death gave the money to his brothers and sisters or their heirs. It was a natural will, but she was not satisfied with its provisions. According to the testimony of two witnesses, she used a dirty expression about the will, and evidently determined that she would have all. It is true that, on one occasion referred to in the year 1918, he seems

to have been able to resist her. Referring to some paper, the witness testified that Mrs. Berger said: "You have to sign this paper; you have to sign it; you have to sign it," for a number of times; and that he said, "I won't do it; I won't do it; I won't do it," and pounded with his cane, yet, as the witness stated, while he resisted, yet he was unnerved. Other witnesses testified to his declarations that the defendant was master. All the testimony on this subject shows that the relationship between them was of a confidential nature. It is true that in Doran v. McConlogue, 150 Pa. 98, it was held: "The mere relation of master and servant or boarder and landlord raises no implication of confidential relation which the courts can consider in proceedings in equity to set aside a conveyance." The same thing was decided in Barnard et al. v. Kell et ux., 271 Pa. 80, but we have found as a fact in the ninth finding that the relationship was a confidential one. In 2 Pomeroy's Eq. Jur., § 955, it is said: "The courts have carefully refrained from defining the particular instances of a fiduciary relation in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which there is confidence reposed on the one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic or merely personal." In Darlington's Appeal, 85 Pa. 512, it was held: "Where parties have a special confidential or fiduciary relation, which affords the power and means to one to take undue advantage or exercise undue influence over the other, a transaction between persons so situated is watched with extreme jealousy and solicitude; and if there be found the slightest trace of undue influence or unfair advantage, redress will be given to the injured party." In Darlington's Estate, 147 Pa. 624, the syllabus is: "The confidential relation is not at all confined to any specific association of the parties to it. While its more frequent illustrations are between persons who are related as trustee and *cestui que trust*, guardian and ward, attorney and client, parent and child, husband and wife, it embraces partners and copartners, principal and agent, master and servant, physician and patient, and, generally, all persons who are associated by any relation of trust and confidence: Authorities reviewed. When such relation exists, the party in whom confidence is placed is held to the strictest accountability. The burden is upon him to show that a transaction between himself and his principal, by which he derives benefit, was fair and conscientious and beyond the reach of suspicion. The rule is founded upon motives of general policy, and is irrespective of any admixture of deceit, imposition, overreaching or other positive fraud. There must be full and clear proof that the transaction was the free and intelligent act of the party, fully explained to him, and performed with a thorough understanding of the transaction and of its consequences." That case is a leading case, and Mr. Justice Green reviews all the authorities on the subject. The same doctrine was held in Matthaei v. Pownall, 235 Pa. 460, the syllabus of which is: "The relation of a physician to his patient is one of trust and confidence, and while such relation does not *per se* forbid the acceptance of a gift or conveyance by him from his patient, the burden is on the physician to prove that such a gift or conveyance was fairly and honestly obtained, and that the transaction was above suspicion. Where a conveyance of the greater part of the grantor's estate was made to one occupying a confidential relation towards him, it is not necessary that actual fraud should appear in order that the conveyance may be set aside." The same doctrine was held in Plankinton's Estate, 212 Pa. 235, the syllabus of which is: "Where an old woman, physically infirm and mentally weak,

2 D. & C.

assigns a mortgage to a person who stands to her in a close and confidential relation, the assignee is bound to show not only that the assignment, as a gift, was righteous and conscientious, but also that the assignor had acted intelligently, deliberately and freely, with full information of the amount of her property, the effect upon her estate, the nature of the assignment, the effect thereof, and that no advantage was taken of the confidential relation. An auditor's findings of fact that the assignee did not meet the above measure of proof, and that he accepted the mortgage in the character of trustee to prevent the assignor from giving it away to some one else to her prejudice, when such finding is sustained by the court below, will not be reversed unless manifest error is made to appear." In Corrigan v. Conway, 269 Pa. 373, the syllabus is: "Where a conveyance of the greater part of the grantor's estate is made to one occupying a confidential relation, it is not necessary to establish actual fraud as a ground for a reconveyance. Where an illiterate woman, seventy-two years old, conveys, by a deed signed by her mark, all of her real estate to a brother, fourteen years younger, who occupied to her a confidential business relation, the grantee will be compelled to reconvey, in the absence of full and satisfactory proof that the deed was the free and intelligent act of the grantor, fully explained to her, and done with a thorough knowledge of the act and all its consequences; and this is so though no actual fraud was shown." Many other authorities might be cited to the same effect, but it is unnecessary to do so. The sum of all the decisions is that where the grantee occupies a confidential relation to the grantor, and where by the transaction the grantee obtains all that the grantor had, public policy requires that the grantee must show that the grantor fully understood the transaction, that it was fully explained to him, and that he understood that he was not only giving up his entire property, but that the scheme of his will would be defeated by the conveyance. The burden in this case was on the defendant to show this, and she in no way discharged that burden. Her contention is practically that as to the stocks, they were worthless, and she derived no benefit from them; that as to the money from the mortgage, it has all been consumed (without admitting the fact of consumption, it may be assumed that there is no money here, either from the mortgage or from the balance of the sale of the first real estate); and that as to the real estate which she now has, the agreement that was entered into on the same day and placed on record shows a good consideration for the transfer. It is true that the courts go a long way in upholding conveyances of property, where the conveyance is for the maintenance of the grantor, particularly in the case of parent and child, and where the conveyance contains in the deed a reference to the terms of maintenance, but these conveyances are sustained on the theory of natural affection between the parties and not where they are strangers. See opinion of McClure, P. J., in Kleckner v. Kleckner, 212 Pa. 515, affirmed by the Supreme Court. See, also, Doran v. McConlogue, 150 Pa. 98, much relied on by the learned counsel for the defendant. In that case it appeared that the defendant was related to the original plaintiff. He had made a will in defendant's favor, describing her as his "esteemed adopted daughter." She lived with him for seventeen years. The plaintiff made a deed of all his property to the defendant in 1885. In 1886 it was reconveyed to him. In 1887 it was conveyed again to the defendant, and the consideration was "$500 and natural love and affection and services rendered me as my housekeeper from the death of my beloved wife." Three years after the conveyance, at the request of the plaintiff, the defendant placed a mortgage on the premises at the plaintiff's request and for his benefit. The only allegation in that bill

was that the deed was procured by fraud and imposition, and there was *no allegation and no proof* of any confidential relation. Mr. Justice Green, in the opinion of the Supreme Court, expressly states in his opinion as follows: "The case is not the ordinary one of a single voluntary conveyance by a person of all or part of his estate to another. A similar conveyance was made by Gardner to Mrs. McConlogue some years before, when there was not the slightest question as to his mental soundness. Subsequently he asked her and her husband to reconvey to him the property, and they did so. He also made at least one will in her favor, giving her all his property, and finally made the deed in question at a time when he supposed he had not long to live." Again, he said: "All the features we have thus referred to establish a wide difference between this case and those which usually appear in the books, in which courts of equity do occasionally, and for reasons specifically operative, exercise the very delicate power of setting aside executed obligations and conveyances of property. We do not consider that any of the persuasive reasons which influence courts in the exercise of this power are present here. For in this case the grantee was not a volunteer, but a meritorious party, who had actually furnished a valuable consideration in the form of substantial personal services for a number of years, of which the grantor had received the full benefit. Added to this, she assumed a pecuniary obligation of the grantor, at his request, to the amount of $600, and conferred a distinct lien upon the property to that extent. The principles upon which a voluntary conveyance are set aside in equity have no application in such a case. It is, moreover, absolutely certain that the grantor knew thoroughly well what he was doing when he executed the deed in question, and thereby did precisely what he intended to do, and had done twice before, both by deed and by will, and it, therefore, cannot possibly be said that he acted in ignorance of the consequences of the transaction." The case is easily distinguishable from the present case. In the same way the case of Barnard et al. *v.* Kell et ux., 271 Pa. 80, may be distinguished from the present case. The syllabus of that case is as follows: "Where a woman executes and delivers a deed of real estate to a man and wife, out of gratitude for services and kindness rendered to her, and she does this with the full intention not to revoke the deed, and upon her own motion, without suggestion from either of the grantees, the absence of a clause of revocation and of independent advice is immaterial. In such a case, where it appears that the husband occupied the position of a messenger or servant to the grantor and that the wife nursed her in her last illness, that the grantor was in no way impaired in mind, and that no fraud was imposed upon her, the deed will not be set aside on the ground of the existence of an alleged confidential relation between grantor and grantees." It also appeared in that case from the opinion of Mr. Justice Shaffer as follows: "To friends and neighbors, Mrs. Boden expressed her interest in, feeling of good-will toward and desire to in some substantial way reward the Kells for their kindness to her; to one of them, who was produced as a witness on the trial, she made the specific declaration that she intended to give the Kells the farm involved in this litigation." Again, he said (bottom of page 84): "The farm represented in value about one-third of the grantor's estate." Again (on page 86), he said: "It is not pretended that the donees had dominion over her mind or could subvert her will to theirs. She had declared her purpose to make a benefaction to them before doing so, and, in executing the deed, carried out her declared intention of rewarding them for their faithfulness and many kindnesses to her. The relation of Kell, the husband, to her was, as found by the court below, that of messenger or ser-

2 D. & C.

vant. It would be going a long way to hold that every faithful servant to whom a gift is made has cast upon him the burden of disproving undue influence because of the relation. We have said 'we cannot see that in the mere relation of master and servant there can be any implication of confidential relation:' Doran v. McConlogue, 150 Pa. 98; but if there was any such burden upon the donees in this case, they have met it by testimony which shows, in granting them the farm, their benefactress made a free-will gift." It would be useless to review the other cases cited. They are plainly distinguishable from the case at bar. The only other matter that need be discussed is the testimony of Mr. La Barre. The writer of this opinion has the highest personal opinion of his integrity, and that opinion is founded upon many years of acquaintanceship and upon long-continued observation of his professional character. He testified that he had been counsel for Mr. Beyl for two or three years before his death; that he prepared the deed and the agreement, and that they were executed in his presence; that he prepared the papers in his office from information that he had gotten from Mr. Beyl, and that he read the papers to him, and that his mental condition was strong and vigorous; but he does not anywhere testify that the effect of the deed and the agreement was explained to Mr. Beyl, and that he knew that he was parting with all his property. That feature is entirely wanting, and the Supreme Court says that where a transfer is made, such as was done in this case, it is not necessary to establish fraud as a ground of reconveyance. It is always an important feature of cases of this kind that the papers were prepared by the party's attorney, but that fact does not take the place of the "full and satisfactory proof" which is required. It does not appear who suggested the separate agreement or why the agreement for maintenance was not inserted in the deed. If that had been done, there would have been something in the line of title to protect Mr. Beyl, but there was nothing. There was neither a clause of revocation nor a charge in the deed. No one searching the title would be bound to look for this agreement in the Book of Miscellanies. It is true that there is little testimony that Mrs. Berger did not fully conform to the terms of the agreement; but the bargain which she made was a hard and unconscionable one, and the only justification for it is the small amount of wages that Mr. Beyl agreed to pay her. However, if her case had disclosed the proof necessary to remove the burden which is cast upon her, we would have sustained the deed; but she has failed to do it, and the deed must be set aside. The bill asks that the mortgage be reassigned, and that the defendant be directed to account for all moneys received from Joseph Beyl. We have already referred to the fact that the evidence fails to disclose that she received any money more than the proceeds of the mortgage. She testified that that was expended in Mr. Beyl's and her support. We do not think that she should be directed to account for any moneys. In Corrigan v. Conway, 269 Pa. 373, following Matthaei v. Pownall, 235 Pa. 460, it was held: "In such case, if it appears that the brother provided liberally for the sister after the conveyance, he will be entitled to receive credit for the moneys which he may have expended upon the real estate, and the sums which he has paid to his sister or for her benefit."

*Decree.*

And now, March 6, 1922, this cause came on to be heard at this term, and, upon consideration thereof, it is ordered, adjudged and decreed that a preliminary injunction issue, restraining Anna L. Berger, *alias* Louisa Berger, from conveying or encumbering the premises described in the deed, Exhibit No. 2 of the plaintiff's bill; and it is further ordered, adjudged and decreed

that the said Anna L. Berger, *alias* Louisa Berger, reconvey to the executor of Joseph Beyl, deceased, the premises mentioned in said deed by a good and sufficient deed within ten days from this date, and that she shall pay the costs of this proceeding. The prothonotary will enter this decree "*nisi*," and give notice of the same to the parties or their counsel, and if no exceptions are filed within ten days, this decree shall be entered by him as a final decree.

From Henry D. Maxwell, Easton, Pa.